# IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION

| | |
|---|---|
| CURTIS R. PENDLETON, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT L. REID, SCOTT B. KAUFFMAN, JERRY R. LICARI, J. CHANDLER MARTIN, T. GRAY MCCASKILL, H. RAY MCKENNEY, JR., JOHN C. REDETT, BOYD C. WILSON, JR. COMMUNITYONE BANCORP, and CAPITAL BANK FINANCIAL CORP.,<br><br>Defendants. | C.A. No. _____<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Curtis R. Pendleton ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his own acts, which is alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of holders of the common stock of CommunityOne Bancorp ("CommunityOne" or the "Company") against the Company and its board of directors (the "Board"), and Capital Bank Financial Corp. ("Capital Bank") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder in connection with the proposed acquisition of CommunityOne by Capital Bank through a merger, as detailed herein (the "Proposed Transaction").

2. On November 23, 2015, CommunityOne and Capital Bank jointly announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") whereby CommunityOne will merge with and into Capital Bank (the "Merger"), with Capital Bank as the surviving corporation in the Merger. Immediately following the Merger, CommunityOne's wholly owned subsidiary, CommunityOne Bank, N.A., will merge with and into Capital Bank's wholly owned bank subsidiary with the Capital Bank subsidiary surviving. The Merger was unanimously approved and adopted by the Board of Directors of each of CommunityOne and Capital Bank. Pursuant to the Merger, each issued and outstanding share of CommunityOne common stock will be cancelled and automatically converted into the right to receive, at the election of each holder and subject to proration: (i) $14.25 in cash or (ii) 0.430 shares of Capital Bank Class A common stock. No more than 85% of the outstanding CommunityOne shares will be converted into shares of Capital Bank and no more than 15% of the outstanding CommunityOne shares will be converted into cash. Two members of the CommunityOne board of directors will join the board of directors of Capital Bank.

3. Capital Bank has entered into a support agreement with each of Oak Hill Capital Partners III, L.P. and Oak Hill Capital Management Partners III, L.P. (collectively, "Oak Hill") and Carlyle Financial Services Harbor, L.P. ("Carlyle"). Oak Hill and Carlyle each beneficially own in the aggregate approximately 23.9% of the outstanding shares of CommunityOne stock. The support agreements generally require that the shareholders vote two-thirds of their shares of CommunityOne in favor of the Merger and against alternative transactions and generally prohibit such shareholders from transferring their shares of CommunityOne prior to the termination of the support agreements or the date CommunityOne obtains shareholder approval for the Merger.

4.     Before announcement of the Proposed Transaction, CommunityOne stock had increased more than 40% during the last twelve months.  It had reported consistently profitable earnings and was beating analysts' expectations.  CommunityOne's strong financial performance is the culmination of a more than three year-turn around during which it was forced to seek a recapitalization in 2011 and its former CEO was removed in 2014.   The prospects for CommunityOne look especially positive.

5.     More important, from Capital Bank's perspective, Community One represents a large and strategic foothold in the established and lucrative Charlotte and North Carolina market and Capital Bank is quickly moving to take advantage of the anticipated benefits of having such a large North Carolina presence.  Indeed, Capital Bank, knowing full well of CommunityOne's improving financial condition and its strategic North Carolina location, and consequently, its great value in a rapidly expanding market, recognized that it had an opportunity to cash in on CommunityOne's undervalued stock price by acquiring CommunityOne before it and its shareholders realized the impact of the Company's improving financial condition.  As such, Capital Bank is in possession of non-public information regarding the performance of CommunityOne and is taking advantage of its position to acquire CommunityOne at a substantial discount to its true value.

6.     Thus, the consideration being offered to CommunityOne public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of CommunityOne common stock is materially in excess of the amount offered given the Company's recent financial performance together with its prospects for future growth and earnings.

7.     To ensure the success of the Proposed Transaction, the CommunityOne Board of Directors (the "Board") locked up the deal by agreeing to impermissible "deal-protection" devices, effectively rendering the Proposed Transaction a *fait accompli*. For example, the Board agreed to: (i) a "no-shop" provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; and (ii) a $14 million termination fee to be paid to Capital Bank if the Board agrees to a competing proposal. Moreover, as indicated above, Capital Bank has entered into support agreements with Carlyle and Oak Tree, which together with other insiders of CommunityOne own 49.2% of outstanding shares, effectively guaranteeing that no other alternative bids will be forthcoming.

8.     In pursuing the plan to facilitate the acquisition of CommunityOne by Capital Bank for grossly inadequate consideration, through a flawed process, the Defendants (defined below) have violated Sections 14(a) and 20(a) of the Exchange Act by causing a materially incomplete and misleading Form S-4 Registration/Joint Proxy Statement ("S-4") to be filed with the U.S. Securities and Exchange Commission ("SEC") on December 21, 2015[1]. The S-4 recommends that CommunityOne shareholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information which renders the S-4 misleading.

9.     Specifically, the S-4 contains materially incomplete and misleading information concerning (i) the background of the Proposed Transaction; (ii) the Company's internal financial data forecasts; and (iii) the financial analyses of the Proposed Transaction performed by CommunityOne's and Capital Bank's financial advisors.

---

[1]     An amended Form S-4 was filed with the SEC on February 16, 2016. References are to the February 16, 2016 S-4.

10.     For these reasons and as set forth in detail herein, Plaintiff seek to enjoin Defendants from taking any steps to consummate the Acquisition or, in the event the Acquisition is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith and due care.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. 17 C.F.R. § 240.14a-9.

12.     The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because CommunityOne maintains its primary place of business in this District.

## THE PARTIES

14.     Plaintiff is, and at all relevant times was a shareholder of Defendant CommunityOne since prior to the wrongs complained of herein.

15.     CommunityOne is a corporation organized and existing under the laws of North Carolina, with its principal executive offices located at 1017 East Morehead Street, Suite 200, Charlotte, North Carolina 28204. CommunityOne describes itself as follows in recent press releases:

> CommunityOne Bancorp is the Charlotte, North Carolina-based bank holding company for CommunityOne Bank, N.A. Founded in 1907 as First National Bank of Asheboro, CommunityOne has grown into a $2.4 billion community bank, operating 45 full service

5

banking branches throughout central, southern and western North Carolina, and loan production offices in Raleigh and Winston-Salem, North Carolina and Charleston, South Carolina.

16.    Defendant Robert L. Reid ("Reid") is Chief Executive Officer ("CEO") of CommunityOne since 2014. Reid is and has been a director since 2011.

17.    Defendant Scott B. Kauffman ("Kauffman") is a Partner at Oak Hill. Kauffman is and has been a director of CommunityOne since 2011.

18.    Defendant Jerry R. Licari ("Licari") is and has been a director of CommunityOne since 2011.

19.    Defendant J. Chandler Martin ("Martin") is and has been a director of CommunityOne since 2011.

20.    Defendant T. Gray McCaskill ("McCaskill") is and has been a director of CommunityOne since 2013.

21.    Defendant H. Ray McKenney, Jr. ("McKenney") is and has been a director of CommunityOne since 2006.

22.    Defendant John C. Redett ("Redett") is and has been a director of CommunityOne since 2014.

23.    Defendant Boyd C. Wilson, Jr. ("Wilson") is and has been a director of CommunityOne since 2011.

24.    The Defendants above are collectively referred to hereinafter as the "Individual Defendants."

25.    Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the

6

liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

26. Capital Bank is a Delaware corporation, with its principal executive offices located at 121 Alhambra Plaza Suite 1601, Coral Gables, FL 33134. Capital Bank describes itself as follows in recent press releases:

> Capital Bank Financial Corp. is a bank holding company, formed in 2009 to create a premier regional banking franchise in the southeastern United States. CBF is the parent of Capital Bank Corp., a State of North Carolina chartered financial institution with $7.3 billion in total assets as of September 30, 2015, and 153 full-service banking offices throughout Florida, North and South Carolina, Tennessee and Virginia.

27. Collectively, the Individual Defendants, CommunityOne and Capital Bank are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

28. Plaintiff bring this action on his own behalf and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on behalf of all holders of CommunityOne common stock who are holders of record and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

29. This action is properly maintainable as a class action because:

(a) The Class is so numerous that joinder of all members is impracticable. As of October 31, 2015 CommunityOne had outstanding approximately 24,292,179 shares of Common Stock. Class members are believed to be geographically dispersed.

(b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical

7

of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(d)    To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

30.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

**SUBSTANTIVE ALLEGATIONS**

A.     **Background**

31.     Before announcement of the Proposed Transaction, CommunityOne stock had increased more than 40% during the last twelve months. It had reported consistently profitable earnings and was beating analysts' expectations. CommunityOne's strong financial performance is the culmination of a more than three year-turn around during which it was forced to seek a recapitalization in 2011 and its former CEO was removed in 2014. The prospects for CommunityOne look especially positive. Indeed, in a report dated September 30, 2015 and entitled "3 Reasons why CommunityOne (COB) is a Great Momentum Stock," Zacks Equity Research made the following observations:

> This method discovered several great candidates for momentum-oriented investors, but today let's focus in on CommunityOne Bancorp (COB) as this stock is looking especially impressive right now. And while there are numerous ways in which this company could be a great choice, we have highlighted three of the most vital reasons for COB's status as a solid momentum stock below:
>
> Short Term Price Change for COMPANY NAME
>
> A great place to look for finding momentum stocks is by inspecting short term price activity. This can help to reflect the current interest in a stock and if buyers or sellers have the upper hand right now. It is especially useful to compare it to the industry as this can help investors pinpoint the top companies in a particular area.
>
> With a one week price change of 0.02% compared to an industry average of 0.00%, COB is certainly well-positioned in this regard. The stock is also looking quite well from a longer time frame too, as the four week price change compares favorably with the industry at large as well.
>
> Longer Term Price Change for CommunityOne
>
> While any stock can see a spike in price, it takes a real winner to consistently outperform the market. That is why looking at longer term price metrics—such as performance over the past three months or year-- and comparing these to an industry at large can be very useful.
>
> And in the case of COB, the results are quite impressive. The company has beaten out the industry at large over the past 12 weeks by a margin of 1.2% to -0.5% while it has also

9

outperformed when looking at the past year, putting up a gain of 21.8%. Clearly, COB is riding a bit of a hot streak and is worth a closer look by investors.

COB Earnings Estimate Revisions Moving in the Right Direction

While the great momentum factors outlined in the preceding paragraphs might be enough for some investors, we should also take into account broad earnings estimate revision trends. A nice path here can really help to show us a promising stock, and we have actually been seeing that with COB as of late too.

Over the past two months, 1 earnings estimate have gone higher compared to none lower for the full year, while we are also seeing 1 earnings estimate going higher compared to none lower for the next year time frame too. These revisions have helped to boost the consensus estimate as two months ago COB was expected to post earnings of 39 cents per share for the full year, though today it looks to have EPS of 41 cents for the full year now, representing a solid increase which is something that should definitely be welcomed news to would-be investors.

Bottom Line

Given these factors, investors shouldn't be surprised to note that we have COB as a security with a Zacks Rank #2 (Buy) and a Momentum Score of 'B'. So if you are looking for a fresh pick that has potential to move in the right direction, definitely keep COB on your short list as this looks be a stock that is very well-positioned to soar in the near term.

32.     More important, from Capital Bank's perspective, Community One represents a large and strategic foothold in the established and lucrative Charlotte and North Carolina market. As detailed in a Charlotte Business Journal article dated November 23, 2015 and entitled "Here's what the impact of CommunityOne's merger with Capital Bank will look like in Charlotte," Capital Bank will be acquiring a very valuable business enterprise in Charlotte.  The article stated, in part:

Capital Bank is boosting its Charlotte's presence.

The Florida-based bank announced on Monday that it's buying Charlotte's CommunityOne Bancorp (NASDAQ:COB). The combined bank will have about $10 billion in assets.

The purchase gives Capital Bank Financial Corp. (NASDAQ:CBF) 45 more branches in North Carolina. Capital Bank executives were especially excited about CommunityOne's

10

position in the Charlotte and Lake Norman areas. The Florida bank has three offices in the region now and will gain 13 branches in the area once the deal is complete.

On a conference call Monday, executives talked about their desire to grow the bank's footprint in an attractive growth market like Charlotte.

"You can see these banks fit well together," said Chris Marshall, Capital Bank's chief financial officer.

Executives said the deal will boost Capital Bank's position in "other attractive markets" including Raleigh, Greensboro and Hickory, too.

Bob Reid, CommunityOne president and CEO, says he is proud of the progress made by the $2.4 billion community bank he leads.

"It's the right time to partner with another institution so we can sustain the momentum we've developed in the last couple years and take advantage of future growth and profitability," Reid said on the call.

Reid has known Capital Bank CEO and chairman Gene Taylor for years.

"I respect what they've been able to accomplish," Reid said.

Taylor added he's watched CommunityOne's progress in Charlotte for a long time now. The bank has cleaned up its balance sheet and diversified its loan portfolio.

"We are partnering with people we know well in markets we have decades of experience in," Taylor said. "Together we will better leverage costs, improve return to investors and even more exciting is what we will be able to do for customers."

The *Charlotte Business Journal* reported that CommunityOne merged with Bank of Granite in 2011— a transaction led by The Carlyle Group to clean up the two banks' distressed balance sheets.

The turnaround took longer and cost more than originally expected. In 2014, the bank's former CEO, Brian Simpson, stepped down— that's when Reid took the helm.

Executives say the deal should close in the first quarter of 2016, pending regulatory approval. They say they expect to keep most client-facing associates and branches. Marshall noted that down the road, the bank may close branches, but that would have happened regardless of the merger.

Marshall said Capital Bank is also going to leverage CommunityOne's strengths in SBA lending and business banking. Reid and CommunityOne board member Scott Kauffman will sit on the combined bank's board.

Executives said they will have more information to share on the integration when the company reports fourth-quarter earnings in January.

33.    Indeed, Capital Bank is quickly moving to taking advantage of the anticipated benefits of having such a large North Carolina presence. As detailed in a Triad Business Journal article dated November 24, 2015 and entitled, "Capital Bank moved charter to N.C. days before the CommunityOne deal," Capital Banks strategy of becoming a major player in the Southeast United States banking market could not be successful without a large presence in North Carolina. The article stated, in part:

> Capital Bank's purchase of CommunityOne Bank will greatly expand its presence in North Carolina, particularly in the Charlotte and Triad markets, when it's complete early next year.
>
> But even before the deal was announced, and regardless of whether it is derailed for some reason, Capital Bank (NASDAQ: CBF) has already made a home for itself in the Old North State.
>
> The bank, which is headquartered in Coral Gables, Fla., last week had its charter officially shifted to North Carolina, making it the newest North Carolina-based bank.
>
> Kenneth Posner, chief of strategic planning and investor relations at Capital Bank, said there's not too much to read into the shift, as it shouldn't cause operational changes.
>
> There are no plans to shift jobs from Capital Bank's Florida headquarters, and its internal infrastructure to handle regulatory matters shouldn't be affected by the change.
>
> For its charter, Capital Bank's headquarters is listed as 333 Fayetteville St. in downtown Raleigh.
>
> "We don't anticipate any job relocations," Posner told me. "We have a lot of people involved in all aspects of compliance and operations and what matters is that they do their jobs well, and not where they happen to be officed."
>
> What the change in charter does reflect is Capital Bank better understanding and defining its mission as a southeastern regional bank rather than a national bank.
>
> Organizers of Capital Bank received a national charter from the Office of the Comptroller of the Currency in 2010 as they prepared to launch the bank, which makes it a nationally chartered bank.

12

"Back then, Capital Bank was created with the strategy of acquiring distressed banks, and we obtained the charter before making our first investment," Posner said.

The charter was issued to the bank as a de novo organization, since it was just starting up, and that operating agreement was lifted in August after five years. That left Capital Bank with the decision of whether to continue as a nationally chartered bank or select a state to be chartered in.

"Our strategy was now clearly that we would aspire to be a Southeastern bank," Posner said. "We don't have any national aspirations."

Asked about the selection of North Carolina as the chartering state, Posner said simply that "we think that's a good place for a Southeastern bank to be."

Tony Plath, finance professor at UNC-Charlotte's Belk College of Business, said North Carolina's banking regulators have a good reputation nationally, making regulation at the state level here likely preferable to regulation by the Office of the Comptroller of the Currency.

"North Carolina has been blessed with professional, competent and apolitical bank regulators," Plath told me. "It hasn't always been that way, but it has been for the last 30 years."

Additionally, North Carolina's regulatory fees are lower than elsewhere, Plath said, meaning Capital Bank is likely to realize some cost savings.

CommunityOne has its own quirks when it comes to saying where it is based. It's a nationally chartered bank whose history is rooted in Asheboro, where it was launched as First National Bank of Asheboro in 1907. Asheboro had been its headquarters, and is still listed as such by the FDIC.

But with its recapitalization after the recession and merger with Bank of Granite in 2013, the bank's holding company, CommunityOne Bancorp, is now based in Charlotte, giving it a dual headquarters in some sense.

Certainly the center of gravity for Capital Bank shifts toward North Carolina once the CommunityOne Bank deal is finalized.

Capital Bank now has about 50 locations in North Carolina, or roughly a third of its 153 locations that are spread across Florida, the Carolinas and Tennessee.

That will nearly double with the addition of 45 branch locations from CommunityOne next year, with the combined bank having roughly 50 percent of its deposit base in the Carolinas.

13

"We have operational and compliance and financial people in Raleigh, in Charlotte, in Coral Gables, in Greenville, Tenn.," Posner said. "So we have people in many different locations and they all are going to keep doing what they're doing."

34.     Capital Bank is well aware of CommunityOne's improving financial condition and its strategic North Carolina location. Knowing that CommunityOne's has great value in a rapidly expanding market, Capital Bank recognized that it had an opportunity to cash in on CommunityOne's undervalued stock price by acquiring CommunityOne before it felt the full effects of its improving financial condition. As such, Capital Bank is in possession of non-public information regarding the performance of CommunityOne and is taking advantage of its position to acquire CommunityOne at a substantial discount to its true value.

**B.     The Proposed Transaction**

35.     On November 23, 2015, CommunityOne and Capital Bank issued a joint press release announcing the Proposed Transaction which stated:

CHARLOTTE, N.C., Nov. 23, 2015 (GLOBE NEWSWIRE) -- Capital Bank Financial Corp. (CBF) and CommunityOne Bancorp (COB) today jointly announced the execution of a definitive merger agreement, pursuant to which Capital Bank will acquire CommunityOne. The combination will strengthen Capital Bank's franchise in North Carolina, particularly in Charlotte, as well as in Greensboro/Winston Salem and the Catawba/Caldwell county area.

Under the terms of the agreement, Capital Bank will acquire CommunityOne by merger, with Capital Bank being the surviving corporation. In the merger, CommunityOne shareholders shall have the right to receive, at the election of each holder and subject to proration, $14.25 per share in cash or 0.43 of a share of Capital Bank Class A common stock, with the total consideration to consist of 85% stock and 15% cash. Based on Capital Bank's closing price of $33.59 as of Friday, November 20, 2015, the merger consideration is valued at approximately $350 million. Capital Bank intends to appoint Bob Reid and Scott B. Kauffman who are current CommunityOne board members to the Capital Bank board of directors upon the completion of the transaction.

The transaction price is a multiple of 1.3x CommunityOne's tangible book value as of September 30, 2015. Capital Bank estimates single-digit EPS accretion in 2016 excluding merger charges and double digit accretion in 2017 and thereafter, which implies an estimated earn-back period of approximately 2.3 years.

14

The transaction has been unanimously approved by the Board of Directors of each company and is subject to Capital Bank and CommunityOne shareholder and regulatory approvals and other customary closing conditions and is expected to close in first quarter 2016.

Capital Bank's Chairman and CEO, Gene Taylor, commented, "This combination creates a high-powered Carolinas franchise while meeting the financial expectations of our shareholders. CommunityOne brings us skilled employees, a complementary branch network, and high-quality loan and deposit relationships, and the transaction improves Capital Bank's returns. We applaud the excellent work of CommunityOne's leadership in turning around one of the Carolina's oldest franchises, and we welcome CommunityOne employees to the Capital Bank team."

CommunityOne's President and CEO Bob Reid added, "We are proud of what we have accomplished at CommunityOne, returning a historic 100 year franchise to profitability and service to its communities and customers. The hard work of our employees over the past four years has put us in position to partner with one of the most exciting growth stories among southeast regional banks. By joining up with Capital Bank, we'll be able to do even more for our customers and communities."

Capital Bank CFO, Chris Marshall commented "CommunityOne represents a great opportunity to expand into another highly attractive Southeast market with enormous growth potential. The acquisition is priced right, and demonstrates our disciplined approach toward capital deployment and consistently improving shareholder returns."

36.    The per share consideration being offered to CommunityOne public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of CommunityOne's common stock is materially in excess of the amount offered given the Company's recent financial performance together with its prospects for future growth and earnings.

37.    As recently as January 29, 2016, in its fourth quarter and year end 2015 earnings release, the Company reported a 16% increase in net income from the 2014 fourth quarter results and a whopping 43% increase from the full year results from 2014.  Analysts Keefe, Bruyette & Woods increased its price target from $11.75 to $13.00 and Zacks investment Research had raised the Company's stock from a "hold" to a "buy" rating and set a target of $15.00 per share.

38. In the November 23, 2015 joint press release announcing the Proposed Transaction, Capital Bank recognized the great value it was obtaining and estimated "single-digit EPS accretion in 2016 excluding merger charges and double digit accretion in 2017 and thereafter, which implies an estimated earn-back period of approximately 2.3 years." Further, Capital Bank CFO, Chris Marshall commented "CommunityOne represents a great opportunity to expand into another highly attractive Southeast market with enormous growth potential. The acquisition is priced right, and demonstrates our disciplined approach toward capital deployment and consistently improving shareholder returns."

39. The process that led to this announced Proposed Transaction was flawed from the beginning. As described in the S-4, beginning in January 2015, the CommunityOne Board began to consider acquisitions of bank and nonbank entities, mergers of equals and strategic sale. S-4 at 64.

40. CommunityOne had discussions with five entities from January 2015 through April 2015. As part of this process, the Company acquired a bank branch from CertusBank, N.A. in the second quarter of 2015. The Company also met with representatives from another entity, called company B in the S-4, resulting in CommunityOne entering into a non-disclosure agreement ("NDA") with company B on January 20, 2015. CommunityOne reviewed several other acquisition opportunities of banking institutions during January through June 2015, but concluded that, given its then current stock price, it would not be competitive in any of those situations. S-4 at 65.

41. The Board then formed a Strategic Planning Committee ("Committee) to review strategic alternatives. From April 2015 through August 2015, CommunityOne unsuccessfully

pursued the acquisition of a nonbank company that engaged in Small Business Administration ("SBA") lending. S-4 at 65.

42.    In May 2015, the CommunityOne Board undertook a formal assessment process of its performance, prospects and alternatives to increase shareholder value, using the assistance of two banks as advisors, Sandler O'Neill + Partners ("Sandler O'Neill") and UBS Securities LLC ("UBS"). S-4 at 65.

43.    The S-4 makes clear that the Board and its advisors reviewed and relied on internal non-public forecasting data created by CommunityOne management on the future prospects of the Company as part of this formal review process. Thus, the S-4 provides that the assessment process set forth a "baseline framework of CommunityOne on a stand-alone basis, using its latest forecast, and compared that baseline to evaluate a series of options, including CommunityOne undertaking a series of acquisitions of small bank and non-bank entities, a merger of equals with a like-size entity, an acquisition of CommunityOne by a larger institution and selling CommunityOne in a strategic sale." Sandler O'Neill and UBS in their review of strategic options for the Company also relied on the ability of "CommunityOne to use its substantial deferred tax asset," potential partners who might provide CommunityOne shareholders with the possibility of increasing their investment potential over different investment horizons, and the potential value of CommunityOne in the future. S-4 at 65.

44.    In its Form 10-K filed on March 6, 2015, the Company reported the following regarding its significant deferred tax asset: We have generated significant federal and state net operating losses ("NOLs") over the past six years. We are generally able to carry NOLs forward to reduce taxable income in future years. Our ability to use our NOLs to reduce future tax payments is dependent upon our ability to sustain profitability over the time period over which these NOLs

17

may be used under applicable tax law. At year-end 2014, we determined that it is now more likely than not that we will be able to realize an additional $142.5 million of the Company's deferred tax assets, which include these NOLs, and as a result, we reversed $142.5 million of the valuation allowance that we had placed on our deferred tax assets as a credit to income tax expense in the income statement, resulting in net deferred tax assets of $146.4 million. We made this determination based upon a number of factors, including a demonstrated track record of profitability for the past six quarters, reasonable forecasts of future taxable income, reasonable tax strategies available to us capable of ensuring the realization of our deferred tax assets, and the absence of the asset quality and credit related losses that generated the Company net operating losses. However, there is no assurance that we will be able to sustain our recent profitability, or accelerate it to the extent necessary to be able to use all of the NOLs we have generated, or that the conditions that led to our losses will not return. Our ability to generate sustained profitability in the amounts necessary to realize our deferred tax assets against future taxable income depends upon general economic and market conditions, interest rates, and our ability to meet our strategic plans. If we are unable to generate adequate sustained profitability, we may be required to record a new valuation allowance against some or all of our deferred tax assets, which would negatively impact our financial results."[2]

---

[2]     According to CommunityOne's first quarter 2015 SEC report filed on November 6, 2015, its net deferred tax asset valuation was $144,091,000 as of September 30, 2015. The Company also reported that prior to December 31, 2014, substantially all of its net deferred tax assets were offset by a valuation allowance and accordingly income tax expense during the third quarter and first nine months of 2014 was primarily the result of changes in the market value of available-for-sale securities that impacted the valuation allowance on its net deferred tax assets. At December 31, 2014 it determined, based on all available positive and negative evidence, that it is more likely than not that future taxable income would be available during available carryforward periods to absorb all of the consolidated federal net operating loss carryforward and all but a small portion of the North Carolina net economic loss carryforward, and accordingly substantially all of the valuation allowance on its deferred tax asset was reversed.

18

45. After the assessment process, the CommunityOne Board agreed on July 23, 2015 to engage Sandler O'Neill and UBS to assist CommunityOne in assessing several strategic alternatives, including a purchase of one or more bank or non-bank entities, a merger of equals with a select group of companies in a manner that could preserve CommunityOne's substantial deferred tax asset, and a strategic sale to a group of larger companies where CommunityOne would be a material percentage of the pro forma combined company's assets, and where there would be a likelihood of material synergies and compatible operating models. The CommunityOne board directed that Sandler O'Neill and UBS contact certain companies identified by the advisors and selected by the CommunityOne board that met the above criteria, beginning with companies where a merger of equals transaction might be appropriate, because the CommunityOne board believed that such a transaction would allow CommunityOne's substantial deferred tax asset to be preserved, and allowed the CommunityOne shareholders to continue to hold a larger stake in the pro forma combined company, potentially providing the CommunityOne shareholders the possibility of appreciation of their investment over time. S-4 65-66.

46. From July through September 2015, Sandler O'Neill and UBS approached three companies, including company B, about a potential merger of equals transaction, and CommunityOne management had discussions with each of these companies, two of which eventually declined to move forward because of other strategic priorities. Management continued discussions with company B and provided company B with access to a diligence data room. CommunityOne and company B discussed the possibility of structuring a merger of equals, but company B expressed concerns with the merger of equals structure, the size of the deferred tax asset of CommunityOne to be preserved and other challenges associated with a merger of equals, including corporate governance, operating models and management, as well as the ability of the

pro forma company to effectively compete in the environment in which the pro forma company would operate. S-4 at 66

47.     During this same time period, after initial contact was made with the companies about a potential merger of equals, Sandler O'Neill and UBS also approached seven additional companies, including Capital Bank, about a potential strategic sale of CommunityOne. Capital Bank expressed an interest in a potential transaction, along with three other companies (company C, company D and company E), all of which (including Capital Bank) signed NDAs with CommunityOne.

48.     The Committee, at its meeting on September 8, 2015, set October 14, 2015 as the deadline for nonbinding expressions of interest to be submitted to the Company.

49.     On October 8, 2015, the President and CEO and the Chief Financial Officer ("CFO") of Capital Bank met with representatives of the two largest shareholders of CommunityOne, affiliates of Carlyle and affiliates of Oak Hill (each of which owns approximately 23.8% of the outstanding CommunityOne common stock and would potentially continue to be large shareholders of a combined company). S-4 at 66-67.

50.     On or around the October 14, 2015 deadline, Capital Bank and company B each provided a non-binding expression of interest that involved a combination of stock and cash as consideration. Capital Bank proposed a fixed price of $13.00 per share of CommunityOne common stock, while company B proposed an exchange ratio that implied a per share value of CommunityOne common stock of approximately $11.12 - 11.47 based on the market price of company B's stock at that time. S-4, 67.

51.     At the October 19, 2015 Board meeting, UBS and Sandler O'Neill reviewed "various financial metrics" with the Board to consider the expressions of interest, and compared

such metrics against median values for precedent transactions, using publicly available information and analyst estimates as a basis for such metrics and comparisons. S-4, 67. These "financial metrics" were on information and belief, internal management forecasts for CommunityOne.

52.     UBS and Sandler O'Neill also reviewed with the Board possible future values of the shares on a forward EPS and tangible book value basis of CommunityOne on a stand-alone basis compared to those of a pro forma company assuming a Capital Bank merger and a merger with company B, assuming 100% stock was issued in the transaction. The Board decided to inform company B and Capital Financial they need to improve the expressions of interest to include more stock and a higher consideration, board representation commensurate with pro forma ownership and, in the case of company B, management participation, given the larger percentage ownership that CommunityOne shareholders would have in the pro forma company. S-4 at 67.

53.     During the week of October 26, 2015 the President and CEO of company B met with representatives of Carlyle and Oak Hill, as well as with Robert L. Reid, CEO, where corporate governance, including board seats and management, as well as business objectives and an operating strategy for a possible combination of CommunityOne with company B were discussed. Company B asked for exclusivity for it to undertake further analysis and conduct further due diligence, but CommunityOne declined to provide exclusivity to company B. S-4 at 67.

54.     During this time period, the Committee met six times to review the content of the discussions that UBS and Sandler O'Neill and management were having with each potential party, and provide guidance, as necessary and appropriate. During these meetings, the Committee also reviewed with Sandler O'Neill and UBS the range of possible outcomes relating to price and other considerations that could be received from Capital Bank and company B. The Committee also

decided to extend the deadline for submitting revised written expressions of interest was November 13, 2015. S-4, at 68.

55. On November 13, 2015, CommunityOne received a revised written expression of interest from Capital Bank, which provided, among other things, for a merger transaction, where the consideration would be a combination of 85% stock and 15% cash. Capital Bank raised its price to a fixed price of $14.00 per share of CommunityOne common stock, and offered to name two current directors of CommunityOne to the Capital Bank board. Capital Bank also provided an initial draft of an agreement and plan of merger which set forth the material terms of the Proposed Transaction, as set forth in the expression of interest. S-4 at 68.

56. The Committee met on November 14, 2015 to discuss the revised written expression of interest from Capital Bank and determine whether to contact company B for its revised expression of interest. As a result of that meeting, Sandler O'Neill was directed to contact company B's financial adviser and advise them of the pricing parameters, stock/cash consideration mix, management and corporate governance matters that CommunityOne would require in revised expression of interest from company B for CommunityOne to continue to pursue discussions with company B, and a deadline of November 16, 2015 for providing such expression of interest. S-4 at 68.

57. On November 16, 2015, company B provided an oral revised expression of interest, with an exchange ratio that implied a per share value of approximately $12.75, given the market price of company B's stock at that time. The Committee met on November 16, 2015 to consider and evaluate the revised written expression of interest from Capital Bank Financial and the updated oral revised expression of interest from company B. The Committee reviewed and discussed extensively a presentation from Sandler O'Neill and UBS regarding the financial aspects

of the revised written indication of interest from Capital Bank and the updated oral revised expression of interest from company B. The Committee (i) directed Sandler O'Neill and UBS to prepare a presentation for the full CommunityOne Board that would evaluate the Capital Bank written revised expression of interest compared to operating CommunityOne on a stand-alone basis rather than compared to any expression provided by company B, given the contingencies associated with the company B proposal, and the fact that company B declined to conduct substantial additional due diligence after its initial expression of interest was submitted, and (ii) determined to recommend to the CommunityOne Board that the CommunityOne Board approve moving forward with the process to finalize a transaction with Capital Bank. S-4 at 68-69.

58.    On November 17, 2015, the CommunityOne Board (other than the directors who represent Carlyle and Oak Hill) met to evaluate the Capital Bank revised expression of interest and the results of the process relating to company B. The Board other than the Directors who represent Carlyle and Oak Hill discussed the oral revised expression of interest from company B, compared to the revised written expression of interest from Capital Bank, and concluded unanimously that approaching company B to negotiate any further increase in its offer to approach the revised, higher offer from Capital Bank would not be successful and thus should not be further considered. The Board also discussed the Capital Bank proposal against remaining independent, including the benefit to CommunityOne shareholders of combining with a larger bank at a premium to CommunityOne's historic stock price, the complementary branch network and business operating model, and proposed representation on the pro forma Company's Board, as well as the risk of the U.S. Treasury re-evaluating the rate which determined the amount that CommunityOne's deferred tax asset would be limited if CommunityOne continued to operate on a stand-alone basis and was

Case 5:16-cv-00037   Document 1   Filed 02/29/16   Page 23 of 42

later sold, and the risk and impact of Capital Bank growing over $10 billion in assets on a pro forma basis, as well as the possible impact of a Capital Bank Financial transaction on CommunityOne's customers, employees and communities. The Board requested that Sandler O'Neill and UBS approach Capital Bank to negotiate a further increase in price, as well as the setting of a fixed exchange ratio. In addition, assuming that the parties could reach agreement on price, the CommunityOne Board approved moving forward with the process to finalize a transaction with Capital Bank, including completion of due diligence by CommunityOne on Capital Bank and the negotiation of a final merger agreement. S-4 at 69.

59.     After the meeting on November 17, 2015, Sandler O'Neill and UBS negotiated an increased price with Capital Bank, reaching an exchange ratio of 0.43 for the 85% of the purchase price to be represented by stock, and $14.25 per share for the cash portion of the purchase price. Between November 18 and November 22, CommunityOne and its advisors conducted due diligence on Capital Bank. S-4 at 69-70.

60.     On November 22, 2015, the Board met to consider matters arising from the Proposed Transaction.  Management also reviewed the agreement reached with executive management, and accepted by Capital Bank, to accelerate executive management's restricted stock awards and payment of short term incentives pursuant to CommunityOne's incentive plan, as well as reduce parachute payments to stay within the limits of Section 280G of the Internal Revenue Code.  Thereafter, the Boards of both companies voted to approve the Proposed Transaction. S-4 at 70-71.

24

## D.    The Preclusive Deal Protection Devices

61.    Despite CommunityOne's prospects for future profitability and analysts' estimates of future stock price targets, Defendants targeted the sale of the Company to Capital Bank and agreed to onerous deal provisions and other agreements to ensure a sale only to Capital Bank.

62.    As part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

63.    First, the Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations. The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations. Further, in addition to the no-shop and standstill provisions, the Merger Agreement includes a $14 million termination fee that will all but ensure that no competing offer will emerge.

64.    Specifically, §6.12(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by Capital Bank. This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors.

65.    To further ensure the success of the Proposed Transaction, the Board locked up the deal by agreeing to pay a termination fee of $14 million. The terms of the Merger Agreement

25

essentially requires that the alternative bidder agree to pay a naked premium for the right to provide CommunityOne shareholders with a superior offer.

66. Moreover, Capital Bank has entered into support agreements with Carlyle and Oak Tree, which together with other insiders of CommunityOne own 49.2% of outstanding shares, effectively guaranteeing that no other alternative bids will be forthcoming.

67. These provisions cumulatively discourage bidders from making a competing bid for the Company.

### E. The Incomplete & Materially Misleading S-4

68. On December 21, 2015, Capital Bank filed the S-4 (as amended on February 16, 2016) with the SEC in connection with the Proposed Transaction. The S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the S-4 fails to provide the Company's shareholders with material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed by Sandler O'Neill, UBS, and Evercore Group, LLC ("Evercore"). As a result of the incomplete and misleading S-4, CommunityOne' shareholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction.**

69. The S-4 fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement. In particular, the

26

*Background of the Merger* and *Recommendation* sections contained on pages 64-71 of the S-4 is materially deficient in that it fails to disclose the following information:

(a)    Economic, market, and other conditions unique to CommunityOne that existed at the beginning of January 2015 that the Board took into account in consideration of a strategic sale of the Company (S-4 at 64);

(b)    The duration of the non-disclosure agreement ("NDA") between CommunityOne and Company B, and the other companies identified in the S-4 contacted about a potential strategic acquisition, the NDA terms that could impact their ability to negotiate with and submit proposals to the Company (S-4 at 65);

(c)    The rationale for the Board's conclusion that it would not be competitive in any of the acquisition opportunities reviewed in January through June 2015 (S-4 at 64);

(d)    The reason CommunityOne was unsuccessful in entering into a transaction with the nonbank company that engaged in SBA lending (S-4 at 65);

(e)    The date when the CommunityOne Board created the Strategic Planning Committee (the "Committee"), the rationale for creating the Committee, the Board members that make up the Committee (including former members of Committee if its composition has changed, and if so the rationale for changing its composition), and all of its functions and responsibilities;

(f)    The (i) rationale for engaging UBS and Sandler O'Neill, (ii) the duties and responsibilities of UBS and Sandler O'Neill, (iii) the fee structure for UBS, and (iv) whether CommunityOne Board considered engaging other

financial advisors to advise the Board on alternatives to increase shareholder value;

(g) The manner in which the "deferred tax asset" was valued prospectively and the impact that asset had on the field of potential acquirers who were contacted about a transaction (S-4 at 65);

(h) The "latest" forecasts that were presented to and relied on by the Board in May 2015 to assess the process of CommunityOne's performance, prospects and alternatives to increase shareholder value and to set forth a baseline framework of CommunityOne on a stand-alone basis (S-4 at 65);

(i) Company B's concerns with a "merger-of-equals" structure with the Company including the size of the deferred tax asset of CommunityOne to be preserved and other challenges associated with a merger of equals, including corporate governance, operating models and management, as well as the ability of the pro forma company to effectively compete in the environment in which the pro forma company would operate during discussions from July through September 2015 (S-4 at 65-66);

(j) The rational and basis for Sandler O'Neill and UBS to contact certain companies about a "merger of equals" with the Company while it contacted other companies regarding a strategic sale of the Company (S-4 at 66);

(k) The rational for the Committee's decision to establish October 14, 2015 as a deadline for companies to submit nonbinding indications of interest and then the November 13, 2015 deadline for submitting revised written expressions of interest (S-4 at 66);

28

(l)   The rational for the Board's decision not to contact other larger strategic buyers (S-4 at 66);

(m)   The purpose and discussions at the October 8, 2015 meeting between President and CEO and the Chief Financial Officer of Capital Bank Financial met with representatives of the two largest shareholders of CommunityOne, affiliates of Carlyle and affiliates of Oak Hill (each of which owns approximately 23.8% of the outstanding CommunityOne common stock (S-4 at 66-67);

(n)   The various financial metrics evaluated by Sandler O'Neill and UBS with the Board on October 19, 2015 to consider the expressions of interest by company B and Capital Bank (S-4 at 67);

(o)   The contingencies associated with the company B proposal as of November 16, 2015 that were discussed with the Committee and the Board an d the reasons why company B had not as of that date conducted substantial due diligence (S-4 at 69);

(p)   The involvement that the directors who represent Carlyle and Oak Hill  had in the sales process with Capital Bank and the other entities described in the S-4 regarding the strategic alternatives that are discussed in the S-4 (S-4 at 64-71);

(q)    The basis for the Board's decision at the November 17, 2015 board meeting that approaching company B to negotiate any further increase in its offer to approach the revised, higher offer from Capital Bank Financial would not be successful and thus should not be further considered (S-4 at 69);

(r)     The results of management's due diligence conducted on Capital Bank Financial that was discussed with the CommunityOne board at the November 17, 2015 board meeting in support of a transaction with Capital Bank (S-4 at 69);

(s)     The anticipated pro forma impact of the transaction on the combined company, including the expected impact on financial metrics including earnings and tangible book value and regulatory capital levels (S-4 at 71);

(t)     The CommunityOne Board's understanding and review of CommunityOne's business, financial condition, results of operations and prospects, including, but not limited to, its business plan and its potential for growth, development, productivity and profitability on a stand-alone basis on which it relied to vote in favor of the transaction (S-4 at 71);

(u)     The basis for the CommunityOne Board's belief that significant growth is required for CommunityOne to be in a position to deliver a competitive return to its shareholders (S-4 at 82);

(v)     The similarities between CommunityOne's and Capital Bank's management philosophies, operating models, approaches and commitments to the communities, customers and shareholders they each serve and their respective employee on which the Board relied to vote in favor of the Proposed Transaction (S-4 at 83);

(w)     When, during the sales process, Sandler O'Neill disclosed to the Board that an affiliate of Carlyle, which hold CommunityOne stock, owned an interest

in Sandler O'Neill and extent of that ownership interest as well as the extent of the affiliate's holdings in CommunityOne (S-4 at 97);

(x)    The basis and rational for the Board's support of a fixed exchange ratio as part of the merger consideration in the Proposed Transaction (S-4 at 83); and

(y)    The pro forma financial impact of the Merger on Capital Bank based on assumptions relating to transaction expenses, purchase accounting adjustments and cost savings, as well as certain assumptions relating to the sale of certain loans in the year ending December 31, 2016, estimated net income for CommunityOne for the years ending December 31, 2016 and December 31, 2017 and the regulation of the pro forma company, as provided by the senior management of Capital Bank, all of which Sandler O'Neill relied on in rendering its fairness opinion in support of the Proposed Transaction (S-4 at 86).

70.    The omission of the above information renders statements in the S-4's "Background of the Merger" and "CommunityOne's Reasons for the Merger; Recommendation of CommunityOne's Board of Director's" sections false and/or materially misleading in contravention of the Exchange Act.

**Materially Incomplete and Misleading Disclosures Concerning CommunityOne's Financial Information and Banker Analysis**

71.    The S-4 fails to provide any of CommunityOne's non-public projected financial data and/or assumptions relating to the Company's future performance. This omission renders the S-4 false and/or misleading as this information was relied on and utilized by the Board, Sandler O'Neill, and by Capital Bank's advisor, Evercore.

31

72. The section of the S-4 entitled "CommunityOne's Reasons for the Merger; Recommendation of the CommunityOne's Board of Directors," discloses the Board's bases for and/or information relied on to recommend that shareholders vote in favor of the Proposed Transaction, including the following: (i) CommunityOne's "business plan and its potential for growth, development, productivity and profitability on a stand-alone basis; (ii) the Board's "belief that significant growth is required for CommunityOne to be in a position to deliver a competitive return to its shareholders"; (iii) the "board's review, with the assistance of CommunityOne's management and legal and financial advisors, of strategic alternatives to the merger, including the alternative of remaining independent; (iv) the "impact on the amount of CommunityOne's deferred tax asset that would be limited if the U.S. Treasury re-evaluated the rate used to determine such limitation upon a change in control"; and (v) "expected pro forma financial impact of the transaction, taking into account anticipated cost savings and other factors, on both CommunityOne shareholders and Capital Bank Financial shareholders." S-4 at 82-84.

73. The Board's recommendation as reflected in the S-4 section entitled "CommunityOne's Reasons for the Merger; Recommendation of the CommunityOne's Board of Directors" is false and/or misleading because, as alleged above, the Board clearly utilized and/or relied on the Company's non-public data regarding its future performance to recommend that shareholders vote in favor of the Proposed Transaction, but the S-4 fails to disclose this information. Absent the data on the Company's future performance, shareholders cannot to weigh and gauge the Board's recommendation. This material information must be disclosed to shareholders prior to any shareholder vote on the Proposed Transaction.

74. The S-4 also discloses that Sandler O'Neill reviewed the following information in creating certain valuations used to render its fairness opinion: (i) the "pro forma financial impact

32

of the merger on Capital Bank Financial based on assumptions relating to transaction expenses, purchase accounting adjustments and cost savings, as well as certain assumptions relating to the sale of certain loans in the year ending December 31, 2016, *estimated net income for CommunityOne* for the years ending December 31, 2016 and December 31, 2017 and the regulation of the pro forma company, as provided by the senior management of Capital Bank Financial;" (ii) a "comparison of *certain financial* and other information for CommunityOne and Capital Bank Financial with similar institutions for which publicly available information is available"; (iii) discussions with management of the *Company's prospects*; (iv) "an *estimated earnings per share growth rate, an estimated annual balance sheet growth rate and an estimated annual loan growth rate for CommunityOne*, as discussed with the senior management of CommunityOne"; and (v) certain *assumptions* relating to transaction expenses, purchase accounting adjustments and cost savings, as well as certain assumptions relating to the sale of certain loans, *estimated net income for CommunityOne* and the regulation of the pro forma company, as provided by the senior management of Capital Bank Financial." S-4 at 86-87.

75. The failure to disclose the emphasized information in ¶74 above reflecting CommunityOne's projected future performance metrics renders the S-4 false and/or misleading with respect to the "Opinion of Sandler O'Neill + Partners, L.P.", "Net Present Value Analysis":

> *Net Present Value Analyses.* Sandler O'Neill performed an analysis that estimated the net present value per share of CommunityOne common stock assuming CommunityOne performed in accordance with publicly available median analyst earnings per share estimates for CommunityOne for the quarter ending December 31, 2015 and years ending December 31, 2016 and December 31, 2017, **27% earnings per share growth for the year ending December 31, 2018, annual balance sheet growth of 6% for the year ending December 31, 2016 and 8% annually thereafter, and annual loan growth of 10% for the year ending December 31, 2015 and 8% annual loan growth for the years thereafter, as discussed with the senior management of CommunityOne. The analysis also**

33

**assumed that CommunityOne would not pay any regular cash dividends through 2018.[3]**

To approximate the terminal value of a share of CommunityOne common stock at December 31, 2018, Sandler O'Neill applied price to 2018 earnings multiples ranging from 12.0x to 20.0x and multiples of December 31, 2018 **tangible book value** ranging from 100% to 180%. The terminal values were then discounted to present values using different discount rates ranging from 9.9% to 13.9% chosen to reflect different assumptions regarding required rates of return of holders or prospective buyers of CommunityOne common stock. As illustrated in the following tables, the analysis indicates an imputed range of values per share of CommunityOne common stock of $7.28 to $13.63 when applying multiples of earnings and $8.80 to $17.80 when applying multiples of tangible book value. [4]

### Earnings Per Share Multiples

| Discount Rate | 12.0x | 14.0x | 16.0x | 18.0x | 20.0x |
|---|---|---|---|---|---|
| 9.9% | $ 8.18 | $ 9.54 | $ 10.90 | $ 12.26 | $ 13.63 |
| 10.9% | 7.94 | 9.26 | 10.59 | 11.91 | 13.23 |
| 11.9% | 7.71 | 9.00 | 10.28 | 11.57 | 12.85 |
| 12.9% | 7.49 | 8.74 | 9.99 | 11.24 | 12.49 |
| 13.9% | 7.28 | 8.49 | 9.71 | 10.92 | 12.13 |

### Tangible Book Value Multiples

| Discount Rate | 100% | 120% | 140% | 160% | 180% |
|---|---|---|---|---|---|
| 9.9% | $ 9.89 | $ 11.87 | $ 13.84 | $ 15.82 | $ 17.80 |
| 10.9% | 9.60 | 11.52 | 13.44 | 15.36 | 17.28 |
| 11.9% | 9.33 | 11.19 | 13.06 | 14.92 | 16.79 |
| 12.9% | 9.06 | 10.87 | 12.68 | 14.50 | 16.31 |
| 13.9% | 8.80 | 10.56 | 12.32 | 14.09 | 15.85 |

---

[3] The highlighted information is on information and belief, non-public internal information concerning the future performance of CommunityOne and was provided by Company management to Sandler O'Neill. The underlying data that is the basis for this information is not disclosed in the S-4.

[4] The highlighted information is on information and belief, non-public internal information concerning the future performance of CommunityOne and was provided by Company management to Sandler O'Neill. The underlying data that is the basis for this information is not disclosed in the S-4.

Sandler O'Neill also considered and discussed with the CommunityOne board of directors how this analysis would be affected by changes in the underlying **assumptions, including variations with respect to net income.**[5] To illustrate this impact, Sandler O'Neill performed a similar analysis assuming CommunityOne's net income varied from 25% above estimates to 25% below estimates. This analysis resulted in the following range of per share values for CommunityOne common stock, applying the price to 2018 earnings multiples range of 12.0x to 20.0x referred to above and a discount rate of 11.9%.

**Earnings Per Share Multiples**

| Annual Budget Variance | 12.0x | 14.0x | 16.0x | 18.0x | 20.0x |
|---|---|---|---|---|---|
| (25.0)% | $ 5.78 | $ 6.75 | $ 7.71 | $ 8.67 | $ 9.64 |
| (15.0)% | 6.55 | 7.65 | 8.74 | 9.83 | 10.92 |
| (5.0)% | 7.33 | 8.55 | 9.77 | 10.99 | 12.21 |
| 0.0% | 7.71 | 9.00 | 10.28 | 11.57 | 12.85 |
| 5.0% | 8.10 | 9.45 | 10.80 | 12.14 | 13.49 |
| 15.0% | 8.87 | 10.35 | 11.82 | 13.30 | 14.78 |
| 25.0% | 9.64 | 11.25 | 12.85 | 14.46 | 16.06 |

S-4, pp.93-94.[6]

76.     The S-4 expressly cautions that the tables showing Sandler O'Neill's valuations in support of its fairness opinion, such as those reproduced above must be read together with the "accompanying text," but the text, as described above, fails to disclose all of the information relied on by Sandler O'Neill as reflected above in ¶74. S-4 at 88.

77.     The above statements in ¶75 from the S-4 are rendered false and/or misleading by the omissions of CommunityOne's projected financials and other financial information highlighted

---

[5] The highlighted information is on information and belief, non-public internal information concerning the future performance of CommunityOne and was provided by Company management to Sandler O'Neill. The underlying data that is the basis for this information, including but not limited to the Company's projected net income, is not disclosed in the S-4.

[6]     Similar information was omitted with respect to Sandler O'Neill's Present Value Analyses for Capital Bank at S-4, pp. 95-96.

above as this information is integral to shareholders' evaluation of the consideration being offered in the Proposed Transaction. Indeed, the projected financial information and data provide a sneak peek into CommunityOne's expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity. More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company. Accordingly, it is no surprise that projected financial metrics and data are among the most highly sought after disclosures by stockholders in the context of corporate transactions such as this.

78. With respect to Sandler O'Neill's *Comparable Companies Analyses,* the S-4 discloses on page 90-91 the mean and median financial information for the "CommunityOne Peer Group", but fails to disclose whether the selected ranges represent the high/low multiples from all the selected companies and fails to disclose the individual financial data used for each of the selected companies making up the CommunityOne Peer Group. The S-4 also fails to disclose the pricing data as of November 20, 2015 used to obtain the Price/LTM earnings per share multiples, the price/2015 earnings per share multiples, and the price/2016 earnings per share multiples. The omission of this information renders the following statements from pages 88-89 of the S-4 false and/or materially misleading in contravention of the Exchange Act:

**Capital Bank Financial Comparable Company Analysis**

|  | Capital Bank Financial(1) | Capital Bank Financial Peer Group Median | Capital Bank Financial Peer Group Mean |
|---|---|---|---|
| Total assets (in millions) | $ 7,261 | $ 7,919 | $ 7,639 |
| Tangible common equity/Tangible assets | 12.25% | 9.12% | 9.11% |
| Tier 1 leverage ratio | 13.60% | 10.28% | 10.21% |
| Total risk-based capital ratio | 16.38% | 12.56% | 12.98% |
| LTM Return on average assets | 0.78% | 0.98% | 1.11% |

| | | | |
|---|---|---|---|
| LTM Return on avg. equity | 5.06% | 8.28% | 8.92% |
| LTM Net interest margin | 3.94% | 4.10% | 4.13% |
| LTM Efficiency ratio | 64.8% | 57.2% | 55.9% |
| Loan loss reserves/Gross loans | 0.86% | 0.77% | 0.79% |
| Nonperforming assets(2)/Total assets | 0.99% | 0.97% | 0.97% |
| Price/Tangible book value | 170% | 261% | 263% |
| Price/LTM Earnings per share | 29.5x | 20.6x | 21.4x |
| Price/2015 Earnings per share(3) | 26.4x | 17.8x | 19.5x |
| Price/2016 Earnings per share(3) | 21.2x | 15.8x | 16.5x |
| Current dividend yield | 1.2% | 1.3% | 1.4% |
| Market value (in millions) | $ 1,470 | $ 1,489 | $ 1,844 |

79.      These statements in the S-4 are rendered false and/or misleading by the omissions

identified in ¶78 because such omissions are essential to shareholders' ability to properly evaluate

the analysis performed by Sandler O'Neill.

80.      Similarly, with respect to   Sandler O'Neill's *Analysis of Selected Merger*

*Transactions,* the S-4 discloses on page 93-94 that "Sandler O'Neill reviewed the following

multiples: transaction price to last-twelve-months earnings per share, transaction price to [2016]

estimated earnings per share, transaction price to tangible book value per share, tangible book

premium to core deposits, and 1-day market premium. Sandler O'Neill compared the indicated

transaction metrics for the merger to the median metrics of the Regional Precedent Transaction

group (the group of transactions selected by Sandler O'Neill).  S-4 at 90. However, the S-4 fails

to disclose the multiples for each of the transactions observed in the analysis.

81.      The omission of this information in ¶80 renders the following table in the S-4 false

and/or misleading in contravention of the Exchange Act:

| | CommunityOne/ Capital Bank Financial Median | Regional Precedent Transactions Group |
|---|---|---|
| Transaction price/LTM earnings per share | 43.1x | 24.6x |
| Transaction price/2016 estimated earnings per share(1): | 25.3x | 22.9x |
| Transaction price/Tangible book value per share: | 131% | 178% |
| Transaction price/Adjusted tangible book value per share(2): | 174% | |
| Core deposit premium(3): | 5.2% | 11.3% |
| Adjusted core deposit premium(2)(3): | 9.3% | — |
| 1-Day market premium: | 4.2% | 20.8% |
| Adjusted 1-Day market premium | 21.4% | — |

37

(1) Based on median analyst earnings per share estimates as reported by FactSet.
(2) Reduction of tangible common equity due to Section 382 limitation of $66 million, as provided by CommunityOne's management.
(3) Tangible book premium to core deposits calculated as (deal value—tangible equity) / (core deposits); core deposits defined as deposits, less time deposit accounts with balances over $100,000, foreign deposits and unclassified deposits.

82.     These statements in the S-4 are rendered false and/or misleading by the omissions identified in ¶80 because, without the individually observed multiples for the chosen comparable transactions, stockholders are unable to adequately assess whether CommunityOne is being appropriately valued in relation to precedent transactions selected and reviewed by Sandler O'Neill.   For example, without this information, stockholders have a limited ability to gauge whether the applied multiples are appropriate given the differences between CommunityOne and the subject transactions.   Moreover, P/E multiples are rarely used in connection with a precedent transaction analysis warranting a disclosure of whether Sandler O'Neill analyzed other multiples for the selected transactions, but excluded them from its summary, and if, so the reasons for excluding the other observed multiples.

83.     The S-4 also provides that Capital Bank's advisor, Evercore, reviewed and relied on non-public projected financial data to prepare certain valuations of CommunityOne on a standalone and pro forma basis, including reflecting synergies. While the S-4 provides that Capital Bank management prepared the projected financial data for CommunityOne, on information and belief, the non-public inputs utilized to created projections was provided by CommunityOne management.   S-4 at 73. The omission of this information renders the following statements in the S-4 "CommunityOne Valuation Analysis" (S-4 75) false and/or materially misleading in contravention of the Exchange Act: (i) Standalone Dividend Discount Model Analysis (S-4, 75-76); (ii) Selected Peer Group Trading Analysis (S-4 76); and (iii) Selected Precedent Transaction Analysis (S-4, 77-78).   Absent disclosure of CommunityOne's projections and/or non-public data

38

inputs and metrics used to created CommunityOne's projections, these valuations are false and/or misleading as CommunityOne's shareholders have no manner to weigh and/or gauge these valuations in order to make an informed decision whether to vote in favor of the Proposed Transaction as recommended by the Board.

## COUNT I

### On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act Against the Company and the Individual Defendants

84.     Plaintiff repeats and realleges each allegation set forth herein.

85.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.

86.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

87.     Specifically, the S-4 violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth *supra*.  Moreover, in the exercise of reasonable care, Defendants should have known that the S-4 is materially misleading and omits material facts that are necessary to render it non-misleading.

88.     The misrepresentations and omissions in the S-4 are material to Plaintiff who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

89.     Plaintiff and the members of the Class have no adequate remedy at law.

# COUNT II

## Claims for Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

90.    Plaintiff repeats and realleges each allegation set forth herein.

91.    The Individual Defendants acted as controlling persons of CommunityOne within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the CommunityOne, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

92.    Each of the Individual Defendants were provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

94.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The S-4

purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

95. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

97. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in their favor and in favor of the Class and against Defendants as follows:

A. Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representatives and his counsel as Class Counsel;

B. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Acquisition, unless and until Defendants disclose the material information identified above which has been omitted from the S-4;

C. Rescinding, to the extent already implemented, the Acquisition or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  February 29, 2016.

/s/ Janet Ward Black
Janet Ward Black
NC State Bar 12869
Attorney for Plaintiffs
Ward Black Law
208 W. Wendover Ave.
Greensboro, NC  27401
336-333-2244
jwblack@wardblacklaw.com

/s/ Nancy R. Meyers
Nancy R. Meyers
NC State Bar 23339
Attorney for Plaintiffs
Ward Black Law
208 W. Wendover Ave.
Greensboro, NC  27401
336-333-2244
nmeyers@wardblacklaw.com

42